UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| WILLIAM JOINER, et. al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | CAUSE NO. 1:13-cv-555-WTL-DKL |
| ) | |
| THE BOARD OF TRUSTEES OF THE ) | |
| FLAVIUS J. WITHAM MEMORIAL ) | |
| HOSPITAL, ) | |
| ) | |
| Defendant. ) | |

### ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment (dkt. no. 29). The motion is fully briefed, and the Court, being duly advised, **GRANTS IN PART** the motion for the following reasons, and to the extent, set forth below.

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party

bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

The facts that follow are those taken in the light most favorable to Plaintiffs William Joiner, Chad Bradler, and Greg Dozier. Additional relevant facts are included in the Discussion section below.

### A. Background of the Parties

Witham Health Services operates Witham Memorial Hospital ("Witham") in Lebanon, Indiana. Joiner, Bradler, and Dozier were employed as Maintenance Specialists for Witham. As hourly employees, they were required to take unpaid thirty-minute meal breaks during each shift. However, during their breaks, they were required to be on call and were frequently called on to perform their duties. They were not compensated for this work time.

Joiner was employed by Witham from 1987[1] to January 2, 2012, when he voluntarily resigned. Bradler was employed by Witham from January 2009 to September 27, 2011, when he voluntarily resigned. Dozier was employed by Witham from April 21, 2010, until February 7, 2011,[2] when he voluntarily resigned to start his own business. He reapplied and was rehired by Witham and was employed from November 18, 2011, until July 25, 2012, when he voluntarily resigned again.

---

[1] Joiner's amended complaint states that he was employed by Witham beginning in 1987. In his deposition, Joiner testified that he started working for Witham around 1989. The Court finds this discrepancy irrelevant to Joiner's claim.

[2] Dozier's amended complaint states that he voluntarily resigned on February 7, 2011. In his deposition, he testified that he resigned on February 8, 2011. The Court finds this discrepancy irrelevant to Dozier's claim.

Joiner and Bradler generally worked the first shift (8:00 a.m. to 4:30 p.m.); Bradler occasionally worked the second shift (4:00 p.m. to 12:30 a.m.). Dozier worked the second shift during his first employment period and the first shift during his second employment period. Each worked occasional weekends, ranging from every other weekend to every fifth weekend.

### B. Witham's Policies

Witham had a Time Clock and Time Entry Exception Process Policy ("the Policy") that established guidelines to ensure that the work time of hourly employees was accurately recorded and compensated in compliance with hospital policy and federal and state regulations. The Policy stipulated that employees had to accurately keep their time; if employees did not clock in or out, they had to notify their managers immediately. Employees were held accountable for the accuracy of their time and hourly employees were prohibited from working off the clock for any reason. Bradler and Dozier were aware of the Policy. Joiner testified that he did not specifically recall the Policy: "I may have even signed a thing saying I have seen it, you know. But I've got documents they send around to us and they hand them to us and tell you to look at it and sign it, and lot of times I just sign it and give it back to them." Joiner Dep. 50:11-16.

Pursuant to the Policy, if employees failed to clock in or out, needed to request time off, did not take a meal break, or needed to make necessary changes to the automated timekeeping report, they were required to report their changes on a time entry form. Joiner used these forms to report certain changes in his schedule; however, he did not use these forms to report when he had to work during lunch because he "never thought about it," even though he knew they could have been used for this purpose. *Id.* at 82:22. Bradler used these forms to report other changes, but he did not use them to report when his meal breaks were interrupted. When Dozier used the form to record missed breaks, they were not approved.

Witham also had an attendance policy that stipulated that hourly employees were not permitted to work during unpaid meal breaks. The attendance policy provided that if employees did not receive uninterrupted meal breaks because of work activities, their meal time would be compensated. Similarly, Witham's meal and rest break policy stipulated that employees were to receive and take one thirty-minute, unpaid, uninterrupted meal break each workday. Employees were not required to clock in and out for their meal breaks unless they left the hospital grounds. Employees were to be relieved of all active responsibilities and restrictions during meal periods; employees required to perform substantial work during the meal period were supposed to notify their supervisor and request to record the time as worked time. The supervisor could extend the lunch period, authorize overtime, or allow the employee to leave early to compensate for the unpaid work time. The Plaintiffs all understood this policy but did not necessarily follow it. Joiner does not remember reporting that he worked during his lunch break or asking to be paid for that time, testifying: "When you get called off of [the meal break], you just never said anything. You just went ahead and did it." *Id.* at 60:20-22.

Witham also had an On Call/Call Back Compensation Policy. It stipulated that employees with on call status had to ensure that Witham's operators had a way of contacting the person through an acceptable and reliable communication device at all times during the on call status, and they had to return the call within five minutes. Pursuant to this policy, for an employee to be deemed an on call employee, managers had to submit an "On Call and Standby Authorization" form to Human Resources. The form had to be approved by Human Resources and the hospital administration.

On January 5, 2010, Witham distributed a memo to maintenance department employees that set schedules to ensure that employees received uninterrupted breaks and meals. It stated

4

that emergencies were exceptions and were to be covered as needed, but were not expected to be common practice for altering the break and meal schedule. Joiner received this document, reviewed it, and signed it. The memo was created before Bradler began his employment, but he saw a copy of it at some point and read it. Dozier did not see the memo, but he still understood that if he had to work through a meal period, he was supposed to notify his supervisor so he could be paid for it or have his time compensated in an alternate way. At an August 10, 2011, maintenance department meeting, Steve Strawmyer, Director of Plant Operations, advised the Maintenance Specialists that if they were unable to take a meal break, they could leave early and inform him to ensure the time was credited. Joiner and Bradler attended this meeting.

### C. Joiner's Specific Allegations

Joiner regularly clocked in and out throughout the week. He was supposed to receive a lunch break, "but didn't always get one. Just seemed like every time you'd go to the lunch break, Steve would call you for something. Used to call me practically every day. I'd get down, and get sat down and he'd call me for something." *Id.* at 40:15-20. During the last two years of Joiner's employment, Strawmyer would call during lunch "two or three times a week at least." *Id.* at 69:4. Sometimes Strawmyer would say not to worry about the matter; other times he would say, "Go take care of this real quick." *Id.* at 69:7-9. Joiner did not remember how many times Strawmyer asked for something to be taken care of quickly: "I don't remember whether it was one, two, or a hundred." *Id.* at 69:12-13.

Though Joiner testified that Strawmyer called frequently, he recalled only one specific instance, a time when Strawmyer called during his meal break and asked him to fix an automatic door. He did not remember when the call took place, where he was when he took the call, or which automatic door he was asked to fix. Joiner did not remember other calls he received from

5

Strawmyer asking him to work during his lunch break: "It was just I'd get a call once in a while from Steve and he'd say go do this, go do that. I'm not even remembering specifics about what call [sic] was even about." *Id.* at 74:25-75:1-3. He did not report these interruptions to anyone at Witham because he thought it was not necessary and he "figured it wouldn't do any good." *Id.* at 77:24. During his uninterrupted meal breaks, Joiner ate and talked with other hospital staff. No one told him he could not leave the facility for the one or two occasions when he left during his meal period.

### D. Bradler's Specific Allegations

During his orientation, Bradler reviewed and signed a document that stated he had been trained on work hours and attendance, schedules, the overtime policy, rest and meal times, time off requests, and the paid time off policy. He took his break in the designated areas, and on weekends and second shift could not leave the facility, but had no other restrictions on what he could do during his meal break. Still, during the break he had to carry his radio, and if someone called, he had to respond. His lunch breaks were interrupted more on the second and third shifts than on the first shift: "You get a little bit of it on the first. Ricky [Ray, Plant Operations Supervisor] was pretty good about on first shift kind of making sure that didn't happen to us . . . [S]o I didn't really see that happen too much then." Bradler Dep. 66:12-17.[3] When he worked through his lunches on the first shift, he took a lunch at a different time. He was called a couple times to the ward upstairs and to fix a door. He was "sure there was also something else that I've been called to, but I don't recall what it was or when." *Id.* at 69:10-12.

Bradler told Ray when his meal breaks were interrupted on the first shift, but he did not report when his meal breaks were interrupted on a second or weekend shift. On those shifts,

---

[3] Later, when asked how many times his meal breaks were interrupted during the day shift, Bradler responded, "[a] dozen or two at least." Bradler Dep. 81:9-10.

6

emergency calls interrupted about thirty percent of his meal times. Once he was called to the psychiatric ward. He was also called to the emergency room, but "I don't know specifically. I'm sure when I was called up there, it was to help with somebody. . . . It's hard for me to recall a specific that was happening to a weekend one." *Id.* at 73:8-14. Bradler did not remember whether he complained to anyone about the interrupted meal breaks during these shifts. "[I][j]ust kind of took it as job related . . . I'm sure I mentioned it at some point, but I don't remember specifics of how or when." *Id.* at 89:19-22.[4] During his uninterrupted meal breaks, Bradler listened to talk radio, ate in the café, and occasionally left the facility to eat lunch with his wife.

### E. Dozier's Specific Allegations

Dozier reviewed the attendance policy and the meal and rest break policy during his orientation. During his first employment period, he was the only maintenance employee at the facility. He had work orders that told him what to do, and he received calls all evening from his radio. If the time clock was not working, or if he requested vacation or a personal day, he filled out a form for Ray to authorize. There were five or six times during his first employment period when he took a break that was interrupted, and he was unable to take another break to make up for it. He did not remember why his breaks were interrupted: "It's just things at the hospital that I remember not getting lunches . . . I cannot remember specifics." Dozier Dep. 96:15-18. He testified that "we discussed it a lot when we had our departmental meetings." *Id.* at 67:1-2.[5]

---

[4] Bradler earlier testified that he reported the interruptions to Ray, but "it wasn't a big deal at that point. You know, you do what you got to do." Bradler Dep. 70:4-6. Ray never told him not to take an uninterrupted lunch or not to make it up.

[5] Toward the end of his deposition, however, Dozier testified that "I basically hardly ever went to a meeting." Dozier Dep. 122:24-25.

7

Dozier submitted a form to Ray about five or six times stating that he needed to be paid for his interrupted meal break, which Ray returned unapproved.[6]

He testified that he did not remember how many times during his second employment period he was unable to make up an interrupted lunch break: "It would just be a guess. . . . It could be two, could be ten" or it could be one. *Id.* at 87:15-17. Dozier remembered one instance where his day was interrupted because the air handler went down, but he did not remember the date or time of day that it happened, only that it was before his meal break and he worked on it during his meal break.

### III.  DISCUSSION

In their amended complaints,[7] Plaintiffs assert claims for: 1) wages under the Fair Labor Standards Act ("FLSA"); 2) violation of the Indiana Wage Payment Statute; 3) breach of contract; and 4) unjust enrichment. Their claims will be addressed, in turn, below.

#### A. Wages Under the Fair Labor Standards Act

In Count 4 of the Plaintiffs' amended complaints, they allege that they were required to work overtime and were not paid time and a half in violation of 29 U.S.C. § 207 (the FLSA). "The FLSA requires employers to pay overtime to certain employees who work more than 40 hours in a work week. The employee[s] bear[] the burden of proving that [they] performed overtime work for which [they were] not properly compensated." *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011) (internal citations omitted). The Plaintiffs allege that they worked more than forty hours in a work week because they regularly worked during their unpaid meal breaks.

---

[6] Dozier later testified that he could have submitted the form fewer than five or six times and could have submitted the form only once.

[7] Bradler did not file an amended complaint; however, his original complaint is the same as Joiner's and Dozier's amended complaints.

8

Witham argues that the Plaintiffs' meal periods are not compensable because "meal periods ordinarily are not 'work' time under the FLSA." *Barefield v. Vill. of Winnetka*, 81 F.3d 704, 710 (7th Cir. 1996). The Seventh Circuit has adopted the predominant benefits test to determine whether meal periods are work periods.[8] "Under this test, a meal period is not work time if the employee's time is not spent predominantly for the benefit of the employer." *Id.* (internal quotation marks omitted). Ultimately, the Court agrees with Witham that the Plaintiffs' lunch breaks were not spent for the predominant benefit of Witham.

In *Barefield*, the police officer and civilian employee plaintiffs were required to attend but were not compensated for a fifteen-minute "roll call" before each shift. A shift was an eight-hour period that included a paid thirty-minute meal period and two paid fifteen-minute breaks. All plaintiffs had to remain on call during their meal periods. The police officer plaintiffs had to remain in radio or telephone contact, remain in or near the town, use an official patrol car to travel, and remain in uniform. The civilian plaintiffs only had to remain in the police department building or in radio contact. The court found that because the civilian plaintiffs' meal periods were not spent to the predominant benefit of the employer, "the meal periods are not compensable under the FLSA, and Winnetka may properly offset the meal break against the

---

[8] Despite clear precedent from the Seventh Circuit supporting the use of the predominant benefits test to determine whether meal periods are compensable, the Plaintiffs argue that the Court should apply a factor test adopted by the Ninth Circuit to determine whether their on call time is compensable because they were on call employees. "[A]bsent a change in the state of the law, it would generally be an abuse of discretion for a district court to follow out-of-circuit precedent which conflicts with binding precedent from its own circuit." *Hart v. Wal-Mart Stores, Inc.*, 360 F.3d 674, 680 (7th Cir. 2004). This Court, therefore, must follow the Seventh Circuit's predominant benefits test. Regardless, the Court does not believe that the Plaintiffs were on call employees. The Plaintiffs rely on Witham's On Call/Call Back Compensation policy and the requirement that they carry their radio and tool pouch with them during meal periods in case of emergencies to show that they are on call employees. But there is no record that the "On Call and Standby Authorization" form required by Witham for on call employees was ever completed by any of the Plaintiffs.

compensable roll call time worked by plaintiffs." *Barefield*, 81 F.3d at 710. Further, the court found that, even though the plaintiffs' meal breaks were paid, that did not transform the break into "work" time.

Similarly, in *Haviland v. Catholic Health Initiatives – Iowa*, 729 F. Supp. 2d 1038 (S.D. Iowa 2010), the plaintiffs, current and former private security officers for hospitals, wanted compensation for their meal breaks due to restrictions that caused them to work through their thirty-minute lunch break. The court considered five factors to determine whether the plaintiffs' meal breaks were spent to the predominant benefit of their employer: the limitations and restrictions placed upon the employees, the extent to which those restrictions benefited the employer, the duties for which the employee was held responsible during the meal period, the frequency in which the meal periods were interrupted, and whether employees were allowed to resume an interrupted break. The court held that the plaintiffs' meal breaks were not compensable because: 1) the defendant only required the plaintiffs to remain on the premises, to monitor the radio, and to respond to emergency calls during their meal periods; 2) the plaintiffs failed to offer any evidence that showed that they were not permitted to continue an interrupted break at a later time; and 3) the plaintiffs knew they were required to inform a supervisor if a meal period had actually been interrupted. *Haviland*, 729 F. Supp. 2d at 1065. Further, the court found that the "[p]laintiffs . . . have failed to provide even a single discrete instance where one of their lunch breaks at those locations was actually interrupted." *Id.* at 1070.

In applying the predominant benefits test to the present case, the restrictions on Plaintiffs' meal breaks—remaining in the building unless they received permission to leave and carrying their radio and tool belt—do not mean that their meal breaks were spent to the predominant benefit of their employer. As Witham notes, the Plaintiffs were expected only to respond to

10

emergencies, which Witham's policy stated were exceptions and not common practice. Further, they were allowed to resume or make up meals and do not remember being told that they could not do so. The Plaintiffs' ability to eat, socialize, listen to the radio, eat off-site with a spouse, and leave the hospital with permission during first shift further suggests that they were relieved of their responsibilities during their meal periods. Finally, as in *Haviland*, the Court finds that the Plaintiffs' failure to cite to specific instances of interruptions suggests that their meal breaks were not spent to the predominant benefit of their employer.

The Plaintiffs cite Witham's policy that required employees to remain at the facility during their shifts, including meal breaks, to show that they worked during their meal breaks. The Court agrees with Witham that this requirement, like the similar requirements in *Barefield* and *Haviland*, does not mean that their breaks were spent to the predominant benefit of their employer. Further, Witham allowed its employees to leave the facility during meal breaks if their supervisor granted them permission to do so.

Moreover, the Plaintiffs did not complete Witham's time entry forms to notify Witham about their interrupted meal breaks, and it was the Plaintiffs' responsibility to follow Witham's policy. The Plaintiffs argue that Witham knew about their interrupted meal breaks because "Mr. Strawmeyer [sic] was making the calls. That is actual knowledge." Pls.' Br. at 11. The Court disagrees. There is no record that the Plaintiffs used Witham's time entry form to inform their supervisors that they missed a lunch, even though they used the forms to report other changes and knew it was available to report missed lunches.[9] *See Kellar*, 664 F.3d at 178 (noting that

---

[9] Dozier testified that he used the forms during his first employment period to report missed meal breaks, but they were returned unapproved. Without records to show the missed meals, the Court does not know whether Dozier worked more than forty hours in a week and therefore cannot determine whether an FLSA violation occurred. Further, as noted earlier,

11

because the employee did not say she was working overtime or that she was not properly compensated the employer "had little reason to know, or even suspect, the employee was acting in direct contradiction of a company policy" that prohibited overtime work without permission). Joiner admits that he did not complain. Bradler said his breaks on first shift were not often interrupted; when they were, Bradler said he reported the interruptions, although he cannot specify when or how he did so. He further admitted that he did not report the interruptions that occurred during his second or weekend shifts. To support their FLSA claim, the Plaintiffs needed to establish that they worked more than forty hours in a week, and without the forms, they cannot show that they did. Therefore, the Plaintiffs cannot establish a FLSA violation.

Finally, the Court notes that even if the Plaintiffs were able to show that there were certain instances in which their lunch breaks were spent predominately for the benefit of Witham, they would not be entitled for overtime pay for *all* of their lunch breaks, regardless of whether they worked during them. Rather, they would have had to produce evidence of specific instances when they worked during their lunch break and were not paid. The Court agrees with Witham that the Plaintiffs have failed in this regard. Despite claims of repeated interruptions, each Plaintiff is unable to state specific instances of when his meal breaks were interrupted and not compensated. For example, Joiner cites one time when he was called to fix an automatic door, but he cannot remember definitively whether that call actually occurred during his meal break. Nor can he remember the frequency of the interruptions: he alleges that Strawmyer called "practically every day," "two or three times a week," and "once in a while." Similarly, Bradler remembers being called to the emergency room, but he does not remember when or why. Finally, Dozier remembers being called to fix a problem with an air handler, but he conceded

---

Dozier is unsure how many times he submitted a form for this purpose and could have submitted it only once.

during his deposition that that situation occurred before his meal period began. Rather than presenting specific instances of working during their meal breaks, the Plaintiffs rely on the general argument that the "[d]efendant's employee, Mr. Strawmeyer [sic], interrupted Plaintiffs' meal breaks all of the time." Pls.' Br. at 8. This general assertion, without evidence to support it, is insufficient to overcome Witham's summary judgment motion. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) (noting that in order to prevail under the FLSA, employees must present evidence that they have "in fact performed work for which [they were] improperly compensated" and show "the amount and extent of that work as a matter of just and reasonable inference.") (superseded by statute on other grounds as stated in *IBP, Inc. v. Alvarez*, 546 U.S. 21, 41 (2005)).

As such, summary judgment is **GRANTED** in favor of Witham on the Plaintiffs' FLSA claims.

### B. State Law Claims

The Defendant also moves for summary judgment on the Plaintiffs' remaining state law claims. The Court's jurisdiction on all of the Plaintiffs' remaining claims is based upon 28 U.S.C. ' 1367, which provides for the exercise of supplemental jurisdiction over claims based upon state law that are closely related to the federal claim(s) in a case. However, "[w]hen the federal claim in a case drops out before trial, the presumption is that the district judge will relinquish jurisdiction over any supplemental claim to the state courts." *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008). There are exceptions to that general rule, and the court should decide the merits of a supplemental state claim when (1) the statute of limitations has run, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial

duplication of effort; or (3) when it is "absolutely clear" how the state claims should be decided. *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008). None of those exceptions apply here. Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining state law claims asserted in the Plaintiffs' complaints and amended complaints, and those claims are hereby **DISMISSED**.

## IV. CONCLUSION

For the foregoing reasons, Witham's motion for summary judgment (dkt. no. 29) is **GRANTED** as to the Plaintiffs' FLSA claims. The Plaintiffs' remaining state law claims are **DISMISSED WITHOUT PREJUDICE**.

SO ORDERED: 07/17/2014

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication